*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

MICHAEL DESHAWN ALTMAN-TUCKER,

Defendant-Appellant.

UNPUBLISHED
December 19, 2025
10:30 AM

No. 369088
Macomb Circuit Court
LC No. 2022-001698-FC

Before: GADOLA, C.J., and MARIANI and TREBILCOCK, JJ.

PER CURIAM.

After a night of drinking at a bar, defendant, Michael Altman-Tucker, became embroiled in an altercation with another patron. The bar's bouncer intervened and started pushing defendant out of the bar. Defendant responded by pulling a concealed pistol, over which the two briefly struggled—three shots were ultimately fired, one of which struck the bouncer in the chest, killing him instantly. A jury subsequently convicted defendant of second-degree murder and other crimes. Defendant appeals the trial court's refusal to instruct the jury on involuntary manslaughter. We affirm.

## I. FACTS AND PROCEDURAL HISTORY

On the fateful evening of February 26, 2022, defendant went to Dooley's Tavern in Roseville, Michigan. Accompanying him was his fiancée, Lyndsey Winkel, and a mutual friend. Their time at Dooley's was unremarkable until Winkel excused herself to the restroom as defendant took care of the bill. While in the bathroom, Winkel met a woman, Samara Edwards, who stated that occasionally "God" speaks to her and told Winkel that God advised her that Winkel "could do better" than defendant. Winkel believed Edwards "was trying to pick a fight."

Upon hearing about that exchange, defendant confronted Edwards. Things escalated quickly. Innocent words between the two rapidly became Edwards touching defendant's face and telling him to calm down, which turned into defendant pulling Edwards by the jacket hood, calling her "a stupid bitch" and slapping her in the face. So Edwards sought help from Julius Bing, the bar's bouncer.

-1-

Bing made an immediate decision. He walked up to defendant and told him, "You're in here putting your hands on females, you gotta get the f**k out." Defendant was not happy, remained confrontational, and resisted leaving, but he ultimately moved toward the exit. Bing also aided defendant's exit—as captured on the bar's video cameras and observed by other patrons, Bing pushed defendant several times.

During the fleeting altercation with Bing, witnesses heard defendant—which he denies—say, "Come outside, I got something for you." As defendant approached the exit, he pulled a black handgun from his waistband—one his concealed pistol license prevented him from carrying because he was in a bar. A struggle in the bar's vestibule ensued between defendant and Bing, with Bing grabbing defendant and pinning him against the wall. Defendant testified that Bing's aggressiveness made him scared for his life. Three distinct shots then rang out in short succession[1] with one hitting Bing in the chest, killing him almost instantly.

Defendant was tried for open murder, assault with intent to murder, and two counts of carrying a firearm during the commission of a felony (felony-firearm). Regarding open murder, the trial court instructed the jury on first-degree and second-degree murder, voluntary manslaughter, and self-defense and accident. Over defendant's objection, however, the trial court declined to additionally instruct the jury on involuntary manslaughter, concluding it was inappropriate given the facts and circumstances of this case. Ultimately, the jury convicted defendant of second-degree murder, MCL 750.317; assault with intent to do great bodily harm less than murder, MCL 750.84; and two felony-firearm counts, MCL 750.22b. The trial court then sentenced defendant to first serve the two-year terms for felony-firearm and then serve concurrent terms of 25 to 50 years and 5 to 10 years for his remaining convictions. Defendant appeals as a matter of right.

## II. JURY INSTRUCTIONS

The only issue on appeal is whether the trial court's refusal to instruct the jury on involuntary manslaughter as a necessarily included lesser offense to murder reflected an abuse of discretion requiring reversal. Through that deferential lens, we hold that the trial court did not abuse its discretion in declining to instruct the jury on involuntary manslaughter. And, even if others would see it differently, we alternatively conclude that such an error was harmless.

### A. INVOLUNTARY MANSLAUGHTER INSTRUCTION

"[M]anslaughter is a lesser included offense of murder." *People v Yeager*, 511 Mich 478, 489; 999 NW2d 490 (2023).[2] Therefore, when a defendant is charged with murder, a trial court must give an instruction on involuntary manslaughter "*if* supported by a rational view of the

---

[1] The video footage indicates that approximately two to three seconds elapsed between the first and second shots, and approximately one second between the second and third shots.

[2] We note that statutory involuntary manslaughter, MCL 750.329, is not a necessarily included lesser offense of second-degree murder, *People v Smith*, 478 Mich 64, 71; 731 NW2d 411 (2007), but the parties make no argument concerning the applicability of that crime here.

evidence." *People v Mendoza*, 468 Mich 527, 541; 664 NW2d 685 (2003) (emphasis added). While claims of instructional error are reviewed de novo, *People v Montague*, 338 Mich App 29, 37; 979 NW2d 406 (2021), this Court reviews a trial court's decision regarding whether an instruction on a lesser included offense is applicable on the facts of the case for abuse of discretion, *People v Jones*, 497 Mich 155, 161; 860 NW2d 112 (2014). An abuse of discretion occurs when the trial court chooses an outcome that falls outside the range of principled outcomes, *id.*, or if it premises its decision on an error of law, *People v Swain*, 288 Mich App 609, 628-629; 794 NW2d 92 (2010). "Reversal of a trial court's jury instruction decision is appropriate only where the offense was clearly supported by the evidence; an offense is clearly supported where there is substantial evidence to support it." *People v McMullan*, 488 Mich 922, 922 (2010).

"[T]he sole element distinguishing manslaughter and murder is malice." *People v Holtschlag*, 471 Mich 1, 21; 684 NW2d 730 (2004) (citation omitted). "Malice" is defined as an act done "with either an intent to kill, an intent to commit great bodily harm, or an intent to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result." *Mendoza*, 468 Mich at 527. For voluntary manslaughter, "the presence of provocation and heat of passion" negates malice. *Id.* at 540. "Involuntary manslaughter is the unintentional killing of another, without malice during the commission of an unlawful act not amounting to a felony and not naturally tending to cause great bodily harm; or during the commission of some lawful act, negligently performed; or in the negligent omission to perform a legal duty." *Id.* at 536.

Stated otherwise, "[i]f a homicide is not voluntary manslaughter or excused or justified, it is, generally, either murder or involuntary manslaughter. If the homicide was committed with malice, it is murder. If it was committed with a lesser mens rea of gross negligence or an intent to injure, and not malice, it is not murder, but only involuntary manslaughter." *Holtschlag*, 471 Mich at 21-22. Gross negligence in the context of involuntary manslaughter involves (1) knowledge of a situation requiring the use of ordinary care and diligence to avoid injury to others, (2) an ability to avoid harm by using ordinary care and diligence, and (3) the "failure to use care and diligence to avert the threatened danger when to the ordinary mind it must be apparent that the result is likely to prove disastrous to another." *People v Alber*s, 258 Mich App 578, 582; 672 NW2d 336 (2003).

With this background, we turn to the issue on appeal: does a rational view of the evidence support a finding that defendant caused Bing's death "by an act of gross negligence or an intent to injure, and not malice." *People v Gillis*, 474 Mich 105, 138; 712 NW2d 419 (2006) (quotation marks, citation, and ellipsis omitted). If so, the trial court was required to instruct the jury on involuntary manslaughter. *Id.* And in our view, we cannot conclude that the trial court abused its discretion when it held that, based on the evidence presented, no rational juror could find that defendant shot Bing without malice.

Key in our mind is defendant's intentionally dramatic escalation of the altercation by securing his gun in his hand while still inside the bar. Defendant described then reaching the exit and being pinned against a wall by Bing, who tried to disarm defendant after he saw that he had the gun in his hand. While defendant does not know if he pulled the trigger, the evidence showed that "the gun was in his hand" and ready to be fired throughout the struggle, *McMullan*, 488 Mich at 922, and that the trigger was pulled three times, one of which resulted in a fatal bullet wound to Bing. No record evidence suggests Bing possessed the pistol, let alone pulled the trigger. Thus,

these facts establish, at minimum, a volitional act by defendant done "in wanton and wilful disregard of the likelihood that the natural tendency of his behavior is to cause death or great bodily harm," and "do *not* demonstrate a grossly negligent handling of a firearm that inadvertently caused death." *Id*. (cleaned up). Put differently, "a rational view of the evidence did not support an instruction of involuntary manslaughter when considering the particular facts of this case." *Id*.

Defendant contends *People v Richardson*, 409 Mich 126; 293 NW2d 332 (1980), dictates a different result. To his credit, both involve a defense premised on a close confrontation, the wrestling over a firearm, and a claimed accidental firearm discharge. *Id*. at 133-137. But that is where the similarities end. There, the defendant testified that he pulled out a gun, "butt end first" and swung it around; then, according to the defendant, the decedent "grabbed the barrel" of the gun, "[t]he two men wrestled and the gun went off." *Id.* at 133. But here, the video evidence made clear that defendant secured his firearm before the altercation escalated, drew his firearm and prepared to use it—he had his finger on the trigger at that point and admitted he "could have" pulled the trigger based on "instinct." The video evidence also made clear that the gun was fired three distinct times. Additionally, defendant acknowledged that he understood it was unlawful to have the firearm in his possession in the bar and nevertheless made the choice to secure it in his hand with his finger on the trigger when inside the bar, and confirmed in his testimony that, while he "fe[lt] bad" about what happened that evening, "he would . . . do it again" if presented with the same scenario "[b]ecause I was afraid for my life."

Nor do this Court's decisions in *People v Martin*, 130 Mich App 609; 344 NW2d 17 (1983), or *People v Hess*, 214 Mich App 33; 543 NW2d 332 (1995), mandate reversal. Defendant contends they state a blanket rule, based on *People v Jones*, 395 Mich 379; 236 NW2d 461 (1975), concerning giving involuntary manslaughter jury instructions when a defendant, as here, claims "accident": "[W]hen accident is asserted as a defense and a voluntary manslaughter instruction is given by the court sua sponte, the court must also instruct on involuntary manslaughter." See, e.g., *Hess*, 214 Mich App at 39; accord *Martin*, 130 Mich App at 611. We are not convinced. First, *Hess* concluded the accident defense was not available for involuntary manslaughter, 214 Mich App at 39, and thus the above-quoted statement is dicta because it was not necessary to its holding, see *Dressel v Ameribank*, 468 Mich 557, 568 n 8; 664 NW2d 151 (2003). Second, both matters concerned a sua sponte instruction, which we do not have here. *Hess*, 214 Mich App at 39; *Martin*, 130 Mich App at 611. Third, our Supreme Court has subsequently rejected the argument that *Jones* "stands for the proposition that *anytime* a trial judge instructs the jury with regard to voluntary manslaughter, it must also instruct the jury with regard to involuntary manslaughter." *People v Heflin*, 434 Mich 482, 500; 456 NW2d 10 (1990). And regardless of these differentiating factors, both cases predated our Supreme Court's current "if supported by a rational view of the evidence" test for evaluating whether an involuntary manslaughter instruction must be given. See *Mendoza*, 468 Mich at 541. Despite defendant's view otherwise, our decision must be guided by this test as done above.

For these reasons, the trial court did not abuse its discretion in concluding the facts did not support or require an instruction on involuntary manslaughter.

## B. HARMLESS ERROR

Alternatively, even if the trial court should have given the jury an instruction on involuntary manslaughter, the error does not require reversal.

The harmless-error analysis applies to instructional error involving necessarily included lesser offenses. *People v Cornell*, 466 Mich 335, 361-362; 646 NW2d 127 (2002). For preserved, nonconstitutional errors, this Court will not reverse unless the error was outcome-determinative. *Id*. at 363-364. Although defendant urges us to amend the harmless-error standard to conform to the standard applied to claims involving ineffective assistance of counsel, see, e.g., *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (1999), we are bound to follow the opinions of our Supreme Court that have not clearly been overruled or superseded, *People v Robar*, 321 Mich App 106, 117; 910 NW2d 328 (2017). Accordingly, we must evaluate defendant's harmless-error argument through *Cornell*'s familiar test: defendant must show that it is more probable than not that the trial court's failure to give the requested instruction undermined the reliability of the jury's verdict. 466 Mich at 364. "[T]he reliability of the verdict is undermined when the evidence clearly supports the lesser included instruction, but the instruction is not given." *Id.* at 365 (quotation marks omitted).

For the reasons already discussed, the evidence presented at trial—even if it were adequate to meet the "rational view" standard for instructing the jury on involuntary manslaughter—fell well short of "clearly support[ing]" the instruction. *Id.* (quotation marks omitted). Furthermore, the trial court instructed the jury that it should find defendant not guilty if it found that defendant did not intend to pull the trigger; the jury rejected that theory to convict defendant of second-degree murder, bypassing voluntary manslaughter and self-defense as well. Accordingly, we cannot say that the failure to instruct the jury on involuntary manslaughter more probably than not undermined the reliability of its verdict. *Id.* at 364.

## III. CONCLUSION

For these reasons, we affirm the trial court's judgment.

/s/ Michael F. Gadola
/s/ Philip P. Mariani
/s/ Christopher M. Trebilcock

-5-